KAREN MATTESON, Cal. Bar No. 102103
Email: mattesonk@sec.gov
FINOLA H. MANVELIAN, Cal. Bar No. 180681
Email: manvelianf@sec.gov
DOUGLAS F. KOBAYASHI, Cal. Bar No. 205886
Email: kobayashid@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Andrew G. Petillon, Associate Regional Director
John M. McCoy III, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>KEVIN H. BLOOD,<br><br>Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa, and Sections 209(d), 209(e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 80b-14. Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in

connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

2. Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district and defendant resides in this district.

## SUMMARY

3. This matter involves fraud and breach of fiduciary duty by Kevin H. Blood ("Blood") through his former investment advisory business, Capital Wealth Management, Inc. ("CWM"), and his hedge fund, ABC-CWM, Inc. ("ABC-CWM"). In late 2008, Blood created and financed ABC-CWM by soliciting certain of his CWM advisory clients and pooling together $10.2 million in client funds. Blood represented to these clients that any investment opportunity for ABC-CWM would be backed by a bank guarantee or other form of collateral, that he would maintain some control over any invested funds to further reduce risk of loss, and that he would not personally benefit from any investment recommendation.

4. In early 2009, Blood recommended to his clients that ABC-CWM loan $10.2 million to Adelaide Partners LLC, which in turn would invest these funds with Amkel Capital, a financial services corporation located in the United Kingdom. Blood represented to his clients that ABC-CWM would receive a bank guarantee in exchange for their $10.2 million loan and earn interest payments of 20% per month for two months. In recommending this investment, Blood breached his fiduciary duty to disclose any conflicts of interest to his advisory clients by negotiating a separate, undisclosed compensation agreement with Adelaide Partners that would inure to his personal benefit. Moreover, contrary to representations he made to his clients, Blood failed to secure any bank guarantee

before transferring his clients' $10.2 million investment, while falsely assuring his clients of the continued safety of their investment. In reality, Amkel Capital was a sham operation run by a convicted felon.

5. The Commission brings this action for a judgment permanently restraining and enjoining Blood against future violations of the federal securities laws and imposing a civil penalty.

## DEFENDANT

6. Kevin H. Blood resides in Scottsdale, Arizona and owned 75% of CWM, which was registered with the Commission as an investment advisor from June 6, 2007, until October 26, 2009. Blood served as CWM's president and chief executive officer from July 2007 until April 2009. From September 2008 to April 2009, Blood also served as the investment adviser to ABC-CWM, a hedge fund he had formed.

## THE FRAUDULENT CONDUCT

A. **The ABC-CWM Hedge Fund Scheme**

7. In September 2008, Blood formed the hedge fund, ABC-CWM, a pooled investment vehicle comprising of $10.2 million invested by twenty of his CWM clients. Blood served as investment adviser to ABC-CWM. While soliciting his clients to invest in ABC-CWM, Blood represented to them that any investment that ABC-CWM made would be backed by a legitimate bank guarantee or other form of collateral. Blood also represented to his clients that their principal would never be at risk because Blood would maintain some control over any account in which the funds were held. Finally, Blood assured his clients that he would not personally profit from any transaction he recommended to them other than by receiving his CWM management fees.

8. During all relevant times, Blood's CWM clients resided predominately in Arizona, but some clients lived in New Mexico and New York. Blood communicated with these clients by email, mail, telephone and in person.

9. In exchange for his CWM clients' investments, Blood caused ABC-CWM to issue to each investor securities in the form of common stock of ABC-CWM and/or a promissory note equal to the value of their investment in ABC-CWM.

**B.    The Adelaide Partners/Amkel Capital Scam**

10. In October 2008, Blood began discussing investments with Clifton Oram of Adelaide Partners LLC, a Wyoming company that refers investors to purported foreign exchange trading platforms. Oram informed Blood that from 2006 through 2008, his firm successfully completed several transactions in purportedly secure trading platforms with the U.K.-based financial services company, Amkel Capital. Oram explained to Blood that in exchange for investing $10 million with Amkel Capital, an investor would receive a $200 million line of credit for one year, secured by a bank guarantee, which Amkel Capital would then use to invest in its high-yield trading platform of medium-term notes.

11. Instead of investing directly with Amkel Capital, Blood worked with Oram to structure the transaction as a loan from ABC-CWM to Adelaide Partners, which was to act as the middleman and transfer the $10.2 million to Amkel Capital in exchange for the $200 million line of credit to trade in Amkel Capital's medium term notes. Blood and Oram began negotiating a joint venture agreement between Adelaide Partners and LWJR Group, Inc., a company Blood created using his wife's name, to split any excess trading profits. Under this agreement, Blood would receive 85% of any profits and Adelaide Partners would receive 15% of any profits after ABC-CWM was paid its principal and interest for the purported loan.

**C.    Continued Misrepresentations And Omissions By Blood**

12. On or around February 6, 2009, acting on Blood's recommendation, his clients agreed to loan $10.2 million from ABC-CWM to Adelaide Partners; Blood accordingly caused ABC-CWM to execute a loan agreement and promissory note. In recommending this investment, Blood represented to his clients that

Adelaide Partners would invest the proceeds in Amkel Capital and that ABC-CWM would receive 20% returns per month for two months for their investment. Blood also reiterated his earlier assurances to his clients that the investment would be backed by a bank guarantee and that he was not personally benefitting from the transaction.

13. On or about February 6, 2009, Adelaide Partners and Blood, through LWJR Group, entered into their undisclosed joint venture agreement to split any excess profits from the ABC-CWM investment. Blood failed to disclose this agreement to his clients, which agreement benefitted Blood personally if his clients invested with Adelaide Partners.

14. On or around February 10, 2009, Blood traveled to London and met with Patrick Danison (a/k/a Eric F. Danison), the president of Amkel Capital, as part of Blood's purported due diligence for his clients. Even though Danison never provided Blood with an executed bank guarantee securing the $200 million line of credit, Blood caused his clients to transfer their $10.2 million in funds from an ABC-CWM account into an Adelaide Partners' bank account that Blood partially controlled.

15. On or around February 10, 2009, after ABC-CWM deposited the $10.2 million into the Adelaide Partners' bank account, Blood authorized Adelaide Partners to transfer the $10.2 million to Amkel Capital's bank account in Switzerland. By February 12, 2009, the funds were transferred and Blood no longer had any control over his clients' $10.2 million.

16. From February to early April 2009, Blood falsely assured his clients that their funds were safe in an account controlled by him. During this time, Blood never disclosed to his clients that he had transferred their funds to Amkel Capital and that he never obtained any bank guarantee or other collateral to secure his clients' $10.2 million investment.

17. In or around mid to late April 2009, after his clients' loan to Adelaide

Partners became delinquent and Blood lost contact with Amkel Capital, Blood informed his clients that he had transferred their funds to Amkel Capital in February without a bank guarantee or collateral.

18.   Amkel Capital's alleged U.K. headquarters was only a short-term rental space. Eric Danison, the president of Amkel Capital, has a criminal record, and he is currently incarcerated in the U.K. pending criminal prosecution.

19.   From January through April 2009, Blood's clients paid CWM approximately $27,961 in management fees for their investment in ABC-CWM. Because these were Blood's clients, CWM paid Blood $25,868 from these fees.

20.   To date, Blood's clients have not received the return of any of their $10.2 million investment.

## FIRST CLAIM FOR RELIEF

**Fraud In Connection With The Purchase Or Sale Of Securities**

**(Violations of Sections 10(b) of the Exchange Act and Rule 10b-5 Thereunder)**

21.   The Commission realleges and incorporates by reference paragraphs 1 through 20 above.

22.   Blood, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, with scienter:

    a.   employed devices, schemes, or artifices to defraud;

    b.   made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.   engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

23. By engaging in the conduct described above, Blood violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Fraud By An Investment Adviser

### (Violations Of Sections 206(1), 206(2) And 206(4) Of The Advisers Act And Rule 206(4)-8 Thereunder)

24. The Commission realleges and incorporates by reference paragraphs 1 through 20 above.

25. Blood, by engaging in the conduct described above, directly or indirectly, by use of the mails or other means or instrumentalities of interstate commerce:

    a. with scienter, employed devices, schemes, or artifices to defraud clients or prospective clients;

    b. engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon a client or prospective client; or

    c. engaged in acts, practices, or courses of business which were fraudulent, deceptive or manipulative, including by:

        (i) making untrue statements of a material fact or omitting to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading, to investors or prospective investors in a pooled investment vehicle, as defined by Rule 206(4)-8(b), 17 C.F.R. § 275.206(4)-8(b); or

        (ii) otherwise engaging in acts, practices or courses of business that were fraudulent, deceptive, or manipulative

with respect to an investor or prospective investor in a pooled investment vehicle.

26. By engaging in the conduct described above, Blood violated, and unless restrained and enjoined will continue to violate, Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2) & 80b-6(4), and Rule 206(4)-8 promulgated thereunder, 17 C.F.R. § 275.206(4)-8.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Blood committed the alleged violations.

### II.

Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Blood, and his agents, servants, employees, and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2) & 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

### III.

Order Blood to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e)(1) of the Advisers Act, 15 U.S.C. § 80b-9(e)(1).

### IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the

1 | terms of all orders and decrees that may be entered, or to entertain any suitable
2 | application or motion for additional relief within the jurisdiction of this Court.

### V.

4 | Grant such other and further relief as this Court may determine to be just and
5 | necessary.

Dated: April 1, 2010

_____
Douglas F. Kobayashi
Attorney for Plaintiff
Securities and Exchange Commission